# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ALBERTO MOLINA, NELSON
SAYAGO, GUSTAVO CEDENO and
HUGO MOSQUERA,

          **Plaintiffs,**

v.                                **Case No:   6:13-cv-1111-Orl-22KRS**

HENTECH, LLC, JIC DRIVE SERVICE,
INC., HENRY NKETEH, DOLLAR
THRIFTY AUTOMOTIVE GROUP, INC.
and HERTZ GLOBAL HOLDINGS, INC.,

          **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **DEFENDANTS DOLLAR THRIFTY AUTOMOTIVE GROUP, INC. AND HERTZ GLOBAL HOLDINGS, INC'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 73)** |
| **FILED:** | **November 3, 2014** |

## I.   PROCEDURAL HISTORY.

Plaintiffs Alberto Molina, Nelson Sayago, Gustavo Cedeno and Hugo Mosquera, on behalf of themselves and others similarly situated, filed an amended complaint against Hentech, LLC ("Hentech"), JIC Drive Service, Inc., Henry Nketeh, Dollar Thrifty Automotive Group, Inc. ("DTAG") and Hertz Global Holdings, Inc. ("Hertz Holdings") alleging that they violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* by failing to pay the required overtime

compensation and minimum wage and that they violated the Florida Minimum Wage Act ("FMWA"), Fla. Stat. § 448.100, by failing to pay the required minimum wage.   Doc. No. 8.[1]   No other individuals filed consents to join the case as party plaintiffs.

The claims against Defendant Nketeh were stayed when he filed a bankruptcy petition. Doc. No. 25.   The claims against Nketeh were voluntarily dismissed with prejudice in the bankruptcy court.   Doc. No. 86.[2]

The Clerk of Court entered defaults against Hentech and JIC Drive Service, Inc. upon motion by Plaintiffs.   Doc. Nos. 39-42.   As of the writing of this Report and Recommendation, Plaintiffs had not filed motions for entry of a default judgment against either of these Defendants.

Defendants DTAG and Hertz Holdings appeared and answered the amended complaint. Doc. No. 72.   They now seek entry of summary judgment in their favor.   Doc. No. 73.   In support of the motion, they filed the following:

- Declaration of Andrew Aldridge ("Aldridge Decl."), Doc. No. 74-1;

- Declaration of Bradford Simmons ("Simmons Decl."), Doc. No. 74-2;

- Deposition of Gustavo Cedeno ("Cedeno Dep."), Doc. No. 88-1;

- Deposition of Hugo Mosquera ("Mosquera Dep."), Doc. Nos. 88-5 through 88-7;

- Deposition of Nelson Sayago ("Sayago Dep."), Doc. Nos. 88-8 and 88-9; and,

- Deposition of Alberto Molina ("Molina Dep."), Doc. Nos. 88-2 and 88-4.

Plaintiffs filed a response to the summary judgment motion.   Doc. No. 79. In support of the response, they filed the following:

---

[1]  In the response to the motion for summary judgment, Plaintiffs withdrew the claim of violation of the FMWA against DTAG and Hertz Holdings.   Doc. No. 79 at 2 n.1.

[2]  Plaintiffs should file a notice of dismissal of their claims against Nketeh in this case.

- Affidavit of Henry Nketeh ("Nketeh Aff."), Doc. No. 79-1; and,

- DTAG's answers to interrogatory 8, Doc. No. 79-2.

DTAG and Hertz Holdings filed a reply to Plaintiffs' response. Doc. No. 83.   In support of the reply, they filed a copy of a document produced by Plaintiffs in response to a request for production of documents.   Doc. No. 84-1.

The parties also filed their Joint Final Pretrial Statement and supporting documents.   Doc. No. 90.

The motion for summary judgment has been referred to me for issuance of a Report and Recommendation.   The motion is now ripe for resolution.

## II.      STANDARD OF REVIEW.

Federal Rule of Civil Procedure 56(a) allows for partial motions for summary judgment, stating, "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* The movant "'bears the initial burden of identifying for the district court those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Cohen v. United Am. Bank of Cent. Fla.,* 83 F.3d 1347, 1349 (11th Cir.1996) (quoting *Cox v. Adm'r U.S. Steel & Carnegie,* 17 F.3d 1386, 1396 (11th Cir.1994)(internal quotation omitted), *modified on other grounds,* 30 F.3d 1347 (11th Cir.1994)).

When the nonmoving party has the burden of proof at trial, the moving party is not required to support its motion with evidence negating the opponent's claim, but it may support its motion with affirmative evidence demonstrating that the nonmoving party will be unable to provide its case at trial.   *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437-38 (11th Cir.

1991)(internal citations and quotations omitted).   If the moving party shows the absence of a triable issue of fact, "the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial.   If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment." *Id.* at 1438 (internal citations and quotations omitted).

When analyzing a motion for summary judgment, a court draws all reasonable inferences from the evidence in the light most favorable to the non-movant. *Porter v. Ray,* 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Lubetsky v. Applied Card Sys., Inc.,* 296 F.3d 1301, 1304 (11th Cir. 2002)). In addition, the court does not make credibility determinations when ruling on a motion for summary judgment. *See Strickland v. Norfolk S. Ry. Co.,* 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 255 (1986)).

## III.     STATEMENT OF FACTS.

DTAG is a rental car company that operates at various locations throughout the United States and the State of Florida (including the Orlando International Airport) for customers travelling from locations throughout the United States and abroad.   Doc. No. 72 ¶ 11.   DTAG's business is renting cars.   Aldridge Decl. ¶ 8.[3]

Hertz Corporation acquired DTAG as a wholly-owned subsidiary on November 19, 2012. Simmons Decl. ¶ 6.   Hertz Corporation is a wholly-owned subsidiary of Hertz Investors, Inc. Hertz Investors, Inc. is a wholly-owned subsidiary of Hertz Holdings.   *Id.* ¶ 4.   Hertz Holdings is a holding company that does not conduct car rental operations.   It is not authorized to do business in Florida, and it does not conduct business in Florida.   *Id.* ¶ 5.   Hertz Holdings never had a contract with Hentech.   It did not manage, supervise or oversee the DTAG operations in Orlando

---

[3] DTAG designated Aldridge as its corporate representative in this lawsuit.   Aldridge Decl. ¶ 1.

at any time.  *Id.* ¶ 7.  Prior to the filing of the complaint, Hertz Holdings did not receive a notice from Plaintiffs regarding their intent to file a claim for unpaid wages.  *Id.* ¶ 8.

Hentech was an independently owned and operated company. Doc. No. 90 at 4. Henry Nketeh was its President, manager and owner.   Nketeh Aff. ¶ 3; Aldridge Decl. ¶ 4.   Hentech had its own offices that were not located at any DTAG or Hertz Holdings facility.   Aldridge Decl. ¶ 4. Hentech held meetings with the drivers at its offices, and drivers picked up pay checks from the Hentech offices.   Mosquera Dep. at 45-46.

On March 25, 2008, DTAG entered into a Master Drive Services Agreement with Hentech to provide drive services to and from DTAG locations.   Aldridge Decl. ¶ 4 & Ex. A (the "Agreement"). Under the Agreement, Hentech was identified as an independent contractor.   Doc. No. 74-1 at 10. The services to be performed by Hentech were non-exclusive. DTAG was permitted to obtain similar services from other providers, and Hentech was permitted to provide similar services to other car rental companies.  *Id.* at 11.   The Agreement required Hentech to provide workers' compensation insurance and to assume the loss caused by theft, destruction or accident to a vehicle in Hentech's possession. *Id.* at 9-10; Doc. No. 90 at 5.   In an addendum to the Agreement, Hentech was required to provide picture IDs of its drivers to be worn around their necks and colored t-shirts or vests that displayed Hentech's name on the back.   DTAG committed to checking with each Hentech driver daily to ensure that the driver then possessed his or her driver's license.   Doc. No. 74-1 at 13.

Because Hentech had no employees when it entered into the Agreement, Eugene Gordon, the general manager of DTAG's Jetport facility in Orlando, Florida,[4] introduced Nketeh to Miguel

---

[4]  The Jetport facility was DTAG's maintenance center.   From May 1, 2011 to July 26, 2013, Andrew Aldridge was employed by DTAG as the City Fleet/Maintenance Manager for Orlando, Florida. He worked at the Jetport location.   Aldridge Decl. ¶ 3.

Gill.   Nketeh Aff. ¶¶ 6, 8.   Gill had worked for the company that transported cars for DTAG before it entered into the contract with Hentech.   *Id.* ¶ 9.   Gill became a lead driver for Hentech, and he recruited other drivers, most of whom had worked for companies that previously provided drive services to DTAG.   *Id.* ¶ 10; Cedeno Dep. at 15-17[5]; Sayago Dep. at 21-22.[6]   Nketeh averred that none of the Plaintiffs or any other Hentech drivers formally applied to work for Hentech.   Nketeh Aff. ¶ 12.   However, Plaintiff Molina testified that he applied to work for Hentech and that he obtained the application from Hentech lead driver Jaime Lazcarro.   Molina Dep. at 11. After they began employment with Hentech, the drivers were required to complete basic employment forms. Nketeh Aff. ¶ 12; Cedeno Dep. at 9-10; Mosquera Dep. at 9-10; Sayago Dep. at 21.   Gill provided the drivers with shirts with Hentech's name on the back and Hentech's logo on the front. Cedeno Dep. at 15; Molina Dep. at 57-58; Mosquera Dep. at 13.

Plaintiffs Cedeno, Mosquera and Sayago worked for Hentech from May 2008 through July 2013.   Cedeno Dep. at 114 (Cedeno answers to interrogatories); Mosquera Dep., Doc. No. 88-7 at 52 (Mosquera answers to interrogatories); Sayago Dep., Doc. No. 88-9 at 36 (Sayago answers to interrogatories); Doc. No. 90 at 5-6.   Plaintiff Molina worked for Hentech from May 2008 through May 25, 2012. Molina Dep., Doc. No. 88-4 at 5 (Molina answers to interrogatories); Doc. No. 90 at 5.

Hentech moved DTAG cars from one location to another, predominately to and from Jetport for service or repair.   Aldridge Decl. ¶ 7; Cedeno Dep. at 19; Doc. No. 73 at 20 ("Defendants do not argue the fact that Plaintiffs used DTAG vehicles to perform their driving duties under the

---

[5] To the extent that the page numbers in deposition transcripts differ from the pages numbers assigned by CM/ECF, I will cite to the page numbers in the deposition transcripts.

[6] Some employees stayed with the previous drive services company, American, rather than becoming employees of Hentech.   Mosquera Dep. at 15.

contract."). Aldridge averred that DTAG did not own any of the facilities from which cars were moved, but Nketeh averred that "[a]ll facilities where work occurred by Hentech employees for [DTAG] were owne[d] by [DTAG]." Aldridge Decl. ¶ 6; Nketeh Aff. ¶ 19.

When DTAG needed to have cars moved among its rental car locations or other facilities,[7] one of its employees informed the Hentech supervisor, Kevin Ngobe, or the Hentech lead driver, if the supervisor was unavailable, of the number of cars that needed to be moved. Aldridge Decl. ¶¶ 10-13; Sayago Dep. at 47, 47-48. Aldridge sometimes told the Hentech supervisor if there were time constraints or deadlines when a car needed to be at a specific location. Aldridge Decl. ¶ 11.

The Hentech drivers reported each day they worked to the Jetport location. Molina Dep. at 62; Sayago Dep. at 82. They wore their Hentech shirts. Molina Dep. at 57-58; Mosquera Dep. at 13; Sayago Dep. at 81. Hentech lead drivers decided which Hentech driver would drive each car. Molina Dep. at 31-32; Mosquera Dep. at 30. DTAG did not assign Hentech drivers or review or approve Hentech's assignments to its drivers. Aldridge Decl. ¶ 12. However, if no lead driver was present, a DTAG employee sometimes assigned the drivers to the cars to be moved. Cedeno Dep. at 23-25, 96-97; Sayago Dep. at 28-29, 60-61. Sometimes, DTAG employee Hector Montalvo also gave Mosquera further instructions about his request to the lead driver for movement of a specific car. *Id.* at 32.

Sometimes a DTAG employee at the location where a driver delivered the first car of the day would tell the driver where to move the next car. Cedeno Dep. at 25; Molina Dep. at 15-16,

---

[7] During certain times from 2008 to 2013, DTAG had, "to some extent, operations out of the Crown-Plaza in Orlando, the Holiday Inn in Lake Buena Vista and University of Central Florida, the Doubletree Hotel in Orlando, the Internal Palms Resort in Orlando, the Orlando Jetport, the Cape Canaveral cruise terminal, Jacksonville, Melbourne, the Sanford airport, the Daytona Beach airport, the Orlando airport, the General Motors rail in Orlando, the Holiday Inn near University of Central Florida, the Ramada Inn in Kissimmee, Ocoee (auction) and Central Florida Auctions." Doc. No. 79-2 at 2 (DTAG answers to interrogatories).

35.[8] On several occasions, a DTAG employee called Cedeno directly and gave him instructions to move a specific car.   Cedeno Dep. at 28.   On one occasion, Aldridge instructed Mosquera to take fifty license plates for cars to Jacksonville.   Mosquera Dep. at 30. Another DTAG employee instructed Mosquera on two occasions to take or pick up a car.   *Id.* at 33-34.

DTAG did not provide training or orientation to the Hentech drivers.   Aldridge Decl. ¶ 16; Cedeno Dep. at 47; Molina Dep. at 45-17, 49-50; Mosquera Dep. at 42; Sayago Dep. at 37, 69-73. DTAG did not provide any tools to Hentech or its employees other than battery chargers and gasoline containers.   Aldridge Decl. ¶ 6; Sayago Dep. at 83.

Initially, the lead drivers supervised the other drivers.   Cedeno Dep. at 40; Molina Dep. at 33; Sayago Dep. at 65.[9]   Later, Kevin Ngobe became a manager for Hentech, and he supervised all the Hentech drivers.   Aldridge Decl. ¶ 10.   During the last four to five months of Hentech's work with DTAG, DTAG employee Isaac came personally to the workplace to supervise the operation.   Cedeno Dep. at 25. Isaac gave instructions to the lead driver.   *Id.* at 26.[10]   For example, Isaac might say that he needed four mid-sized cars moved but he did not assign the specific drivers of these cars.   Cedeno Dep. at 97.[11]

---

[8]   When Molina was assigned to work at the International Palms location, Isaac, the DTAG manager of that location, gave him instructions all day, every day about what cars needed to be cleaned or moved.   Molina Dep. at 17.   Isaac gave directions to Molina because there was no lead driver present. *Id.* at 35. Molina did not always work at the International Palms location.   *Id.* at 36.

[9]   The lead drivers were Jamie Lazcarro, Miguel Gill, Angel Castillo, Edwin Medina and Gustavo Borjas.   Cedeno Dep. at 114 (Cedeno answers to interrogatories); Sayago Dep. at 43, 62.   Sayago occasionally worked as a lead driver.   Sayago Dep. at 48.

[10]   The parties agree that this DTAG employee was Isaac Dickerson, DTAG's senior operations manager for the resorts.   Doc. No. 73 at 12; Doc. No. 79 at 12.

[11]   Cedeno was equivocal about the number of instructions Isaac gave to him.   Cedeno Dep. at 94-95.

DTAG did not and did not have the power to, hire, fire or discipline any Hentech employees.   Aldridge Decl. ¶ 16.   Nketeh averred that if DTAG indicated that it did not want a Hentech driver to move cars on DTAG premises, Hentech was not permitted to question the instruction and immediately removed that driver.   Nketeh Aff. ¶ 17.   Aldridge averred that he instructed Ngobe that a Hentech driver was not to work for DTAG under the Agreement in two instances:   first, when two Hentech drivers took a DTAG car and used it inappropriately to move one of the drivers out of a residence; and, second, when a Hentech driver confronted a customer and chased her through the lot.   Aldridge Decl. ¶ 16.

Hentech lead drivers had control over when the drivers could take lunch.   Cedeno Dep. at 44; Mosquera Dep. at 38; Sayago Dep. at 51. Drivers talked to the lead drivers when they needed to take time off, when they would be late for work or when they needed to leave work early. Molina Dep. at 31; Mosquera Dep. at 38; Sayago Dep. at 45-46, 51. Molina informed the lead driver when he resigned from Hentech to accept a better job at another transportation company. Molina Dep. at 67-68.   The Hentech lead drivers also told the drivers that they were doing a good job and disciplined them as necessary.   Mosquera Dep. at 25-26.

On occasion, DTAG employees directed Hentech drivers to clean a DTAG car or to apply stickers on new cars.   Aldridge Decl. ¶¶ 7, 9; Molina Dep. at 17-20, 22 (Hector Montalvo, a DTAG employee, instructed Molina how to apply stickers when DTAG renewed its fleet and how to clean cars to ready them for rental.); Sayago Dep. at 24-25 (occasionally Montalvo asked Sayago to clean cars). Sayago often refused to clean cars because he did not consider that to be part of his job.   He was not disciplined for refusing to clean cars.   Sayago Dep. at 25-26.

Molina wore a DTAG shirt and cap, which he received from Isaac, when cleaning cars at a DTAG location, but he wore a Hentech shirt when cleaning cars at Jetport.   Molina Dep. at 58-60.

Lead driver Jaime Lazcarro told Molina which shirt to wear depending on whether Molina was working at a DTAG location or at Jetport. *Id.* at 60-61. Molina did not pay for the DTAG shirts and caps, but he did pay for the Hentech shirts. *Id.* at 61.

Hentech drivers were not involved in renting cars to DTAG customers. Aldridge Decl. ¶ 8. DTAG often rented and returned cars to the same location with no need for the cars to be transported. *Id.* On occasion, Hentech drivers had to wait to speak to a DTAG customer service agent, who was assisting customers wishing to rent vehicles, to have the DTAG agent assign a car to driven to another location. Mosquera Dep. at 58, 60.

The Hentech lead driver told the drivers what time to start work the next day and when the work day was over. Cedeno Dep. at 20, 30, 43; Molina Dep. at 26, 28; Mosquera Dep. at 26-27; Sayago Dep. at 44.[12] The drivers' work schedules were set based on DTAG's needs. Molina Dep. at 27; Nketeh Dec. ¶ 13. Each of the Plaintiffs testified that the lead drivers supervised their day-to-day work at Hentech. Cedeno Dep. at 40; Molina Dep. at 33; Mosquera Dep. at 36-37; Sayago Dep. at 65.

Hentech contracted with FrankCrum for its payroll services. Doc. No. 90 at 5. Hentech decided how much to pay its drivers, including Plaintiffs. *Id.* Initially, Hentech paid its drivers an hourly rate. Later, Hentech paid its drivers based on the number of cars moved. Thereafter, Hentech again paid its drivers an hourly rate. Nketeh Aff. ¶¶ 21-22; Doc. No. 90 at 5-6.

At some point, Hentech installed a time clock at the Jetport location. Aldridge Decl. ¶ 14; Cedeno Dep. at 21-22; Mosquera Dep. at 19. The Hentech lead driver told the drivers to use the

---

[12] In about 2012, Ngobe began creating written work schedules and posting them inside the DTAG office next to the time clock or handing them to the drivers. Cedeno Dep. at 21.

time clock.   Mosquera Dep. at 19. Molina testified that, after he clocked in, he gave his time card

to DTAG employee Hector.   Molina Dep. at 53. Molina did not know who received the time card

records.   *Id*. at 53-54. Sayago testified that there was a binder inside a DTAG office by the time

clock that contained the time sheets.   Drivers took a sheet from the binder, clocked in at the

beginning of the day and clocked out at the end of the day.   The Hentech lead driver turned the

time clock sheets into Hentech at the end of the week.   Sayago Dep. at 75-76.

Hentech drivers received their paychecks from the lead driver or at the Hentech offices.

Molina Dep. at 54; Sayago Dep. at 77.   Hentech drivers complained to a Hentech lead driver or

other Hentech employees if the pay received was incorrect.   Cedeno Dep. at 33-34; Molina Dep. at

40-41, 51-52; Mosquera Dep. at 22-23.   DTAG did not see any of Plaintiffs' pay checks, and it did

not know how much Plaintiffs were paid in any paycheck.   Doc. No. 90 at 6.

When drivers were required to pay a toll when moving a car, they submitted a receipt for

reimbursement to the lead driver and were reimbursed in cash.   Cedeno Dep. at 47-48; Sayago Dep.

at 79. Hentech also had a Sun Pass in the van that was used by the lead driver to take drivers to the

location from which cars had to be moved.   Sayago Dep. at 80.

Neither Hertz Holdings nor DTAG paid any Hentech employee.   Aldridge Decl. ¶ 17.

DTAG did not set the rate of pay for Hentech's employees, prepare or approve payroll for Hentech

or approve or review the pay received by Hentech's employees.   *Id.* ¶ 19.   Hentech submitted

invoices for payment to DTAG that included a copy of the moves made per day per location and

toll tickets, if any. The invoices did not include any time records. *Id.* ¶ 17.   DTAG paid Hentech

more than enough for Hentech to adequately pay wages to its employees and comply with the law.

*Id.*¶ 18.   Neither Hentech nor the Hentech drivers reported Hentech's alleged failure to properly

pay wages to DTAG or Hertz Holdings, and Plaintiffs did not send a letter to DTAG or Hertz

Holdings advising them of Plaintiffs' intent to file a claim.  *Id.* ¶ 22; Doc. No. 90 at 6.

In July 2013, Hentech informed DTAG that Nketeh had decided to close the business.

DTAG paid Hentech for all invoices it had submitted, including those corresponding to the last two

weeks of the contract.   Aldridge Decl. ¶ 20.

## IV.    ANALYSIS.

The only issue presented in the motion for summary judgment is whether DTAG and/or

Hertz Holdings are joint employers of Plaintiffs for purposes of the FLSA.   In their Joint Final

Pretrial Statement, the parties correctly agree that to establish joint employment, Plaintiffs must

present evidence of the following factors:

> (1)    nature and degree of control of the workers; (2) degree of
> supervision, direct or indirect, of the work; (3) right, directly or
> indirectly, to hire, fire or modify the employment conditions of the
> workers; (4) power to determine the pay rates or methods of payment;
> (5) preparation of payroll and payment of wages; (6) ownership (or
> leasing) of facilities where work occurred; (7) performance of a
> specialty job integral to the business; and (8) investment in equipment
> and facilities.

Doc. No. 90 at 6.   "[N]o one factor is determinative and the existence of a joint employment

relationship depends on the economic reality of all of the circumstances."  *Id.; accord Layton v.*

*DHL Express (USA), Inc.*, 686 F.3d 1172, 1177 (11th Cir. 2012). The determination of joint

employment is a question of law as applied to the undisputed facts for purposes of summary

judgment.  *Aimable v. Long & Scott Farms*, 20 F.3d 434, 440 (11th Cir. 1994)(citing *Patel v.*

*Wargo*, 803 F.2d 632, 634 & n. 1 (11th Cir. 1986)).

### A.    Defendant Hertz Holdings, Inc.

Plaintiffs do not argue and they have not cited any evidence showing that any of the joint

employment factors exist with respect to Defendant Hertz Holdings, Inc.   The undisputed evidence

is that Hertz Corporation acquired DTAG as a wholly-owned subsidiary on November 19, 2012. Hertz Corporation is a wholly-owned subsidiary of Hertz Investors, Inc., which is a wholly-owned subsidiary of Hertz Holdings.   Hertz Holdings is a holding company that does not conduct car rental operations.   The parties agree that Hertz Holding does not own DTAG.   Doc. No. 90 at 4.

Hertz Holdings did not have a contract with Hentech, it did not manage, supervise or oversee the DTAG operations in Orlando, and it had no knowledge of any of the Plaintiffs in this lawsuit. Hertz Holdings is not authorized to do business in Florida, and it does not do business in Florida.

Accordingly, based on these undisputed facts, I recommend that the Court find that Hertz Holdings was not a joint employer.   Therefore, Hertz Holdings is entitled to entry of summary judgment in its favor.

B.    *Defendant Dollar Thrifty Automotive Group, Inc.*

The facts regarding the joint employment factors are largely undisputed.   To the extent there are disputes, I will construe the facts in the light most favorable to Plaintiffs.

1.    Nature and Degree of DTAG's Control of the Drivers.

"'Control arises . . . when the [purported joint employer] goes beyond general instructions . . . and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work.'"   *Layton*, 686 F.3d at 1178 (quoting *Aimable*, 20 F.3d at 441)).

> A purported employer takes an overly active role in the oversight of work "when it decides such things as (1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained."

*Id.* (quoting *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209-10 (11th Cir. 2003)).

Plaintiffs contend that DTAG exercised control of Hentech from its inception, when DTAG's general manager introduced Nketeh to its first lead driver, Miguel Gill.   There is no

evidence that DTAG required Hentech to hire Gill or any of the drivers Gill recruited, including Plaintiffs.   Accordingly, this evidence does not weigh in favor of a finding of joint employment.

Plaintiffs also assert that DTAG controlled the hours they worked, because they could be required to stay late or leave early depending on DTAG's needs and because DTAG employees at times specified the times and locations at which cars needed to be delivered.   In *Layton*, the Eleventh Circuit found that the business decisions of DHL that directly impacted the drivers' hours of work was indirect control rather than overly active oversight of the drivers.   The court reasoned that DHL had certain objectives that the drivers were tasked with accomplishing.   However, "DHL did not involve itself with the specifics of how those goals would be reached -- it did not apportion tasks to individuals, specify how many individuals should be assigned to each delivery route, or structure the claim of command among Drivers." *Layton*, 686 F.2d at 1178.   For these reasons, the Court found that DHL did not exert the type of control that an employer would have. *Id.*

The facts here are similar to those in *Layton* with respect to the control factor.   Although there is evidence that the Hentech drivers' hours were regulated by the needs of DTAG, there is little evidence that DTAG was actively involved in supervising how the drivers accomplished the needs of DTAG in every instance.   For example, the evidence shows that DTAG employees gave instructions for a certain number of cars to be moved but they did not assign the drivers to move each car or the route to be used to move the cars.   While there are some instances in which a DTAG employee instructed a driver directly to move a car to a specific location, the evidence shows that these instructions were given rarely when a Hentech lead driver was not available.

Plaintiffs also contend that DTAG exercised control over them by assigning them additional tasks, specifically cleaning cars and applying stickers to new cars.   Aldridge averred that these were non-routine requests.   While some of the Plaintiffs testified that DTAG assigned these tasks on

several occasions, the record is insufficient to show that these requests constituted a significant part of the Plaintiffs' work.   For example, Molina testified that when he worked at the International Palms location, Isaac Dickerson gave him regular instructions about moving and cleaning cars, but the record does not reflect how often Molina was assigned to work from that location over the years that he was working for Hentech.

There is also no evidence that DTAG structured the chain-of-command among the drivers. *Id.*   Rather, Plaintiffs testified that the Hentech lead drivers were the supervisors of the drivers and exercised control of the drivers' work.   For example, the undisputed evidence establishes that drivers spoke to a lead driver, not to a DTAG employee, when they needed to come in late, leave early or take time off.   All of these facts weigh against a finding of joint employment.   *See Diaz v. U.S. Century Bank*, No. 12-21224-CIV, 2013 WL 2046548, at * 6 (S.D. Fla. May 14, 2013).

On balance, the control factor weighs in favor of a finding that DTAG was not a joint employer.

2.   <u>DTAG's Degree of Supervision, Direct or Indirect, of the Drivers' Work</u>.

"Supervision can be present regardless of whether orders are communicated directly to the alleged employee or indirectly through the contractor.   '[I]nfrequent assertions of minimal oversight do not constitute the requisite degree of supervision.'"   *Layton*, 686 F. 3d at 1178-79 (citing *Aimable*, 20 F.3d at 441, and quoting *Martinez-Mendoza*, 340 F.3d at 1211). In *Layton*, the Eleventh Circuit found that DHL's supervision of how the drivers loaded their trucks each morning and DHL's auditing of the drivers' vehicles and uniforms was minimal oversight that did not establish the degree of supervision necessary to support a finding of joint employment.

The evidence presented here shows that DTAG employees supervised Hentech drivers sporadically.   There is evidence that during the last four or five months of Hentech's existence,

Isaac Dickerson was personally present at the workplace to oversee operations.   During this time, he gave instructions regarding what cars to move, when and where.   Hector Montalvo also supervised the installation of stickers on new cars, and Dickerson and Montalvo gave Hentech drivers instructions to clean cars. There is, however, no evidence that DTAG audited Hentech's work.

The undisputed evidence shows that on a regular basis the drivers received instructions about which cars to drive from Hentech lead drivers, not from DTAG employees.   Hentech, not DTAG, supervised the drivers regarding work hours, time off and when to go to lunch.   Additionally, Plaintiff Molina tendered his resignation to a Hentech lead driver, not to DTAG.

Plaintiffs also do not cite any evidence showing that Dickerson, Montalvo or other DTAG employees disciplined the drivers if their instructions were not followed.   Indeed, Plaintiff Sayago testified that was not disciplined by DTAG when he refused to clean cars as directed.   In contrast, the undisputed evidence establishes that Hentech lead drivers, not DTAG, disciplined the Hentech drivers when necessary.

For these reasons, this factor does not weigh significantly in favor of a finding of joint employment.

> 3.   <u>DTAG's Right, Directly or Indirectly, to Hire, Fire or Modify Drivers' Employment Conditions</u>.

Plaintiffs argue that DTAG controlled the hiring of the Hentech drivers, but that assertion is not supported by the evidence.   DTAG introduced Nketeh to Gill, and Gill recruited drivers who previously provided drive services to DTAG through other companies.   The undisputed evidence is that these drivers, including Plaintiffs, were hired by Hentech, not by DTAG.   The drivers completed employment paperwork for Hentech.

Plaintiffs further assert that DTAG had the power to fire or otherwise modify the conditions of the drivers' employment.   They rely on the testimony of Nketeh and Aldridge that DTAG could direct that certain drivers not work at its premises.   There is, however, no evidence that DTAG directed Hentech to fire these drivers.   In *Diaz*, the court found that the power to refuse to permit a particular security guard from working at one of a bank's locations constituted only a limited power to modify the employee's employment conditions because the company that hired the security guard could assign him to work for another client.   The court found that "[t]his sort of minimal involvement with the employment process does not suggest joint employment."   2013 WL 2046548, at * 8.   Similarly, in the present case there is no evidence DTAG required Hentech to fire the drivers that could not work at DTAG locations or otherwise prevented Hentech from assigning these drivers to work at Hentech's offices or other non-DTAG locations.

On balance, this factor does not weigh significantly in favor of finding of joint employment.

### 4.   DTAG's Power to Set Drivers' Pay Rates or Payment Methods.

Plaintiffs did not address this factor because they concede that they have not developed evidence to show that DTAG had the power to set the Hentech drivers' pay rates or payment methods.   Doc. No. 79 at 5 n.2.   Therefore, this factor weighs in favor of a finding that DTAG was not a joint employer.

### 5.   DTAG's Preparation of Payroll and Payment of the Drivers' Wages.

Plaintiffs did not address this factor because they concede that they have not developed evidence to show that DTAG prepared the payroll for the drivers or paid the drivers.   *Id.* Therefore, this factor weighs in favor of a finding that DTAG was not a joint employer.

6.      DTAG's Ownership (or Leasing) of the Facilities Where Work Occurred.

Courts have found that the ownership factor is probative of joint employment because (1) without ownership the worker may not have work and (2) a business that owns or controls the worksite will likely be able to prevent labor law violations.  *Martinez-Mendoza*, 340 F.3d at 1214. The evidence established that DTAG owned or otherwise had some control over the facilities where work was performed, such as the Jetport maintenance facility.   It is undisputed that DTAG owed the automobiles that the drivers transported.

To the extent that Hentech did not provide drive services for other car rental companies, as the Agreement permitted it to do, the drivers were economically dependent on DTAG.[13]   However, the evidence also shows that at least Plaintiff Molina could obtain work from other drive service contractors when he wished to do so.

Therefore, this factor weighs only somewhat in favor of a finding that DTAG was a joint employer.

7.      Drivers' Performance of a Specialty Job Integral to the Business.

"'[A] worker who performs a routine task that is a normal and integral phase of the [alleged employer]'s production is likely to be dependent on the [alleged employer]'s overall production process.'"  *Layton*, 686 F.3d at 1180 (quoting *Antenor v. D& S Farms*, 88 F.3d 925, 937(11th Cir. 1996)).   So, for example, at a slaughterhouse where the meat being butchered traveled on an overhead rail from processing station to processing station, the Supreme Court agreed that the workers at each processing station performed a specialty job integral to the business.  *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 725-26 (1947).

---

[13]  The parties have not cited evidence in the record about whether Hentech drivers worked exclusively transporting cars for DTAG.

Plaintiffs argue that the movement of cars was integral to DTAG's business because without having cars available DTAG could not rent them to customers.  There is undisputed evidence, however, that DTAG rented many cars without having to have them transported by drivers.   There is also evidence that much of the movement of cars was to the Jetport maintenance facility for repair and service not to locations where the cars were to be rented to customers. Finally, it is undisputed that the Hentech drivers were not involved in the process of renting a car to DTAG customers. Under these circumstances, the facts support a finding that the Hentech drivers' work was ancillary to the work of DTAG. *Diaz*, 2013 WL 2046548, at * 10.

Further, in *Layton* the Eleventh Circuit found that the drivers who delivered packages for DHL did not perform a specialty job even though DHL was in the business of package delivery because, among other things, the drivers did not work side-by-side with DHL employees and they performed most of their work driving vehicles without direct supervision by DHL.   Granted, in *Layton* the drivers were using their own vehicles while the Hentech drivers drove DTAG vehicles. Nevertheless, the Hentech drivers did not drive the cars side-by-side with DTAG employees, and DTAG did not supervise the way the drivers performed their jobs when driving the vehicles. Therefore, the facts here are not analogous to the production line scenario found to be integral to the slaughterhouse business in *Rutherford*.

This factor weighs in favor of a finding that DTAG was not a joint employer.

8.      <u>DTAG and Hentech's Relative Investment in Equipment and Facilities</u>.

This factor is included "because workers are more likely to be economically dependent on the person who supplies the equipment or the facilities."   *Layton*, 686 F.2d at 1181.   The evidence establishes that both DTAG and Hentech made investments in equipment and facilities.   Each maintained physical locations – the Jetport facility for DTAG and independent offices for Hentech.

DTAG provided the cars to be driven.   Hentech provided the insurance necessary for the drivers to drive the DTAG cars.   Because both DTAG and Hentech invested in items necessary for the work contemplated by the Agreement, this factor does not weigh in favor or against a finding of joint employment.

* * * *

Considering all of the joint employment factors, I recommend that the Court find that the facts, taken in the light most favorable to Plaintiffs, do not establish joint employment.   Courts have regularly found no joint employment between companies hired to provide drive or delivery services and the companies for whom these services are provided.   While this case presents an additional factor not present in other cases – that DTAG owns the cars that the Hentech drivers transported – I recommend that the Court find that this factor is insufficient, in light of the evidence as a whole, to establish that the economic reality of the relationship was that both Hentech and DTAG employed Plaintiffs.   Rather, as discussed above, the drivers considered themselves to be Hentech employees who were supervised by Hentech lead drivers, not by DTAG even though DTAG employees occasionally gave them instructions and supervised their work cleaning and applying stickers to cars. The drivers were paid by Hentech at a rate and in the method determined by Hentech.   Finally, Hentech drivers did not perform a job integral to DTAG's business of renting automobiles to customers.

For these reasons, I recommend that summary judgment also be entered in favor of DTAG.

**V.     RECOMMENDATION**.

For the foregoing reasons, I **RESPECTFULLY RECOMMEND** that the Court **GRANT** Defendants Dollar Thrifty Automobile Group, Inc. and Hertz Global Holdings, Inc.'s Motion for Summary Judgment (Doc. No. 73).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on February 9th, 2015.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy